**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re:<br><br>**VOIP, INC.,**<br><br>    Debtor. | **CASE NO.: 09-20935-RBR**<br>**CHAPTER 7** |
| **MARIKA TOLZ**, Trustee, and<br>**NOCTUA FUND, LP**,<br><br>    Plaintiffs,<br><br>v.<br><br>**BARBARA MITTMAN**, individually, as collateral agent and escrow agent, and as agent for **BRISTOL INVESTMENT FUND, LTD.**; **ELLIS INTERNATIONAL, LTD.**; **ALPHA CAPITAL ANSTALT f/k/a Alpha Capital**; **WHALEHAVEN CAPITAL FUND, LTD.**; **PLATINUM LONG TERM GROWTH II, INC.**; **STONESTREET LIMITED PARTNERSHIP**; **CHESNUT RIDGE PARTNERS, L.P.**; **BRIO CAPITAL, L.P.**; **CENTURION MICROCAP, L.P.**; **DOUBLE U MASTER FUND, L.P.**; **OSHER CAPITAL, INC.**; **CMS CAPTIAL**; **DKR SOUNDSHORE OASIS HOLDING FUND, LTD.**; **PLATINUM LONG TERM GROWTH I, INC.**; and **GRUSHKO & MITTMAN, P.C.**; along with **EDWARD GRUSHKO**, individually, **VONAGE NETWORK, INC.**; **GARYN ANGEL**, individually; **ALLEN ANGEL**, individually; **DAVID MUN-GAVIN**, individually; **ANTHONY CATALDO**; and **SHAWN LEWIS**;<br><br>    Defendants. | **ADVERSARY PROC. NO.** |

<u>**COMPLAINT TO (I) AVOID AND RECOVER PREFERENTIAL AND FRAUDULENT TRANSFERS; (II) DETERMINE THE ALLOWANCE OR DISALLOWANCE OF CLAIMS AGAINST THE BANKRUPTCY ESTATE, (III) DETERMINE VALIDITY,**</u>

1

**EXTENT AND PRIORITY OF LIENS, CLAIMS AND INTERESTS IN PROPERTY OF THE ESTATE; AND (IV) TURNOVER OF PROPERTY OF THE ESTATE**

Plaintiffs, Marika Tolz, as chapter 7 trustee of the bankruptcy estate of Voip, Inc., and creditor Noctua Fund, LP, by and through their respective undersigned counsel, (collectively, "Plaintiffs"), sue Barbara Mittman ("Mittman"), individually and as collateral agent, escrow agent, and agent for Bristol Investment Fund, Ltd. ("Bristol Investment"), Ellis International, Ltd. ("Ellis"), Alpha Capital Anstalt f/k/a Alpha Capital ("Alpha Capital"), Whalehaven Capital Fund, Ltd. ("Whalehaven Capital"), Platinum Long Term Growth II, Inc. ("Platinum Growth II"), Stonestreet Limited Partnership ("Stonestreet"), Chestnut Ridge Partners, L.P. ("Chestnut Ridge"), Brio Capital L.P. ("Brio Capital"), Centurion Microcap, L.P. ("Centurion Microcap"), Double U Master Fund L.P. ("Double U"), Osher Capital, Inc. ("Osher Capital"), CMS Capital ("CMS"), DKR Soundshore Oasis Holding Fund, Ltd. ("DKR"), Platinum Long Term Growth I, Inc. ("Platinum Growth I"), and Grushko & Mittman, P.C. ("G&M"), and sue Edward Grushko, individually, ("Grushko"), Vonage Network, Inc. ("Vonage"), Garyn Angel, individually, Allen Angel, individually, David Mun-Gavin ("Mun-Gavin"), individually, Anthony Cataldo ("Cataldo"), individually, and Shawn Lewis ("Lewis"), individually, and in support thereof would state:

## Jurisdiction and Venue

1.      This is an action to (i) determine the allowance or disallowance of claims against the bankruptcy estate, (ii) recover property of the estate, and (iii) determine the validity, extent and priority of liens, claims and interests in property of the estate, which are core matters as defined by 28 U.S.C. § 157(b)(2)(B), (E), and (K), thus, this court has original jurisdiction over the subject matter hereof.

2.      The plaintiff Marika Tolz ("Trustee") is the chapter 7 trustee of the bankruptcy estate of Voip, Inc. (also referred to as "Debtor"), pending in the United States Bankruptcy Court

for the Southern District of Florida, Fort Lauderdale Division. Case No. 09-20935-RBR (the "Bankruptcy Case").

3.      The plaintiff Noctua Fund, LP ("Noctua") is a Limited Partnership organized under the laws of Delaware.

4.      The defendant Mittman is an attorney who maintains her principal office in New York City, is a resident of the State of New York and is otherwise *sui juris*.

5.      Mittman, in her capacity identified as "collateral agent," is an agent for Bristol Investment, Ellis, Alpha Capital, Whalehaven Capital, Platinum Growth II, Stonestreet, Chestnut Ridge, Brio Capital, Centurion Microcap, Double U, Osher Capital, CMS, DKR, Platinum Growth I, and G&M (collectively, the "Collusive Investor Group").

6.      The defendant G&M is a New York professional services corporation with its principal place of business located in New York, New York and is Mittman's employer.

7.      The defendant Grushko is an attorney who maintains his principal office in New York City, is a resident of the State of New York, is also employed by G&M, and is otherwise *sui juris*.

8.      The defendant Vonage is a Delaware corporation authorized to transact business in the State of Florida.

9.      Mun-Gavin, based on information and belief is a resident of the Netherlands and is otherwise *sui juris*.

10.     Cataldo, based on information and belief is a resident of the State of California and is otherwise *sui juris*.

11.     Lewis, based on information and belief is a resident of the State of Florida and is otherwise *sui juris*.

12.     Venue is proper before this court as the main bankruptcy case in which this adversary action arises is pending in the Southern District of Florida, Fort Lauderdale Division.

## Procedural and Factual History Common to All Counts

13.     The Bankruptcy Case was commenced on June 2, 2009 upon the filing of an involuntary petition for relief under chapter 7 of the United States Bankruptcy Code by creditors Garyn Angel, Carrie Angel and Noctua, and against the Debtor.

14.     Prior thereto, proceedings were had in the Seventeenth Judicial Circuit, Broward County Florida involving the Debtor in various actions, including the three styled *Black Forest International, LLC v. VoIP, Inc.*, Case No. 07-32607 (04), *Angel v. VoIP, Inc.*, Case No. 07-35933 (04), and *Kosh v. VoIP, Inc.*, Case No. 08-000450 (04), in all three of which judgments were entered in favor of the plaintiffs named in each action.

15.     Noctua is one of the three petitioning creditors in the Bankruptcy Case and is the successor in interest to Black Forest International, LLC ("BFI"), the plaintiff named in the first state court action referenced above.

16.     By virtue of the judgment entered in BFI's favor, Noctua became the holder of a judgment against the Debtor in the principal sum of $338,500.00.

17.     Allen Angel is the holder of a judgment against the Debtor in the amount of $89,109.25 entered in the second state court action referenced above, but is not a petitioning creditor in the Bankruptcy Case.

18.     Garyn Angel, the second of the three petitioning creditors in the Bankruptcy Case, is the assignee of a judgment for $391,000 in favor of Stuart Kosh, the named plaintiff in the third state court action referenced above.

19.     In an attempt to satisfy their outstanding judgment claims, Noctua's predecessor BFI, Allen Angel, and Garyn Angel's predecessor Stuart Kosh, initiated garnishment

4

proceedings in their respective state court actions against the telecommunications company Vonage, one of the Debtor's customers.

20.     The three state court actions referenced above were consolidated into the action originally brought by BFI (collectively, the three consolidated state court actions shall be referred to as the "State Court Action").

21.     The third petitioning creditor in the Bankruptcy Case is Carrie Angel, who is the holder of an additional judgment against the Debtor in the principal amount of $152,172.27.

22.     Carrie Angel, although not a party to the State Court Action, obtained her judgment against the Debtor in a fourth state court action she filed against the Debtor in the Circuit Court of the Seventeenth Judicial Circuit, Broward County, Florida. Case No. 07-35933 (14).

23.     Vonage responded to the three separate writs of garnishment issued in the State Court Action by indicating that it was indebted to the Debtor in various amounts depending on when Vonage was required to answer each of the writs.

24.     Ultimately, approximately $840,000 payable by Vonage to the Debtor was deposited, pending further order of court, into the trust account of Legon Ponce & Fodiman P.A. - the Miami law firm representing Vonage (the "Garnished Funds").

25.     With respect to the judgment now in favor of Noctua, approximately $102,000 has been paid by virtue of a separate garnishment proceeding directed towards Wachovia Bank.

26.     Thus, as of the filing of the involuntary petition against the Debtor, the current holders of the judgments participating in the State Court Action - Noctua, Allen Angel and Garyn Angel - claimed to be owed approximately $725,000.

27.     Mittman, who also serves as "collateral agent" for Alpha Capital Anstalt, Brio Capital, L.P., Bristol Investment Fund, Ltd., Centurion Microcap, L.P., Chestnut Ridge Partners LP,

DKR Soundshore Oasis Holding Fund Ltd., CMS Capital, Double U Master Fund, L.P., Ellis International Ltd., Grushko & Mittman, P.C., Iroquois Capital, Osher Capital Inc., Platinum Long Term Growth I Inc., Stonestreet Limited Partnership, Whalehaven Capital Fund Ltd. (collectively, the "Collusive Investor Group"), claims that the Collusive Investor Group is owed in excess of $20,000,000 by the Debtor on various convertible promissory notes issued by the Debtor in favor of each of the members of the Collusive Investor Group.

28.     It is Mittman's position that the Collusive Investor Group has priority over Noctua's, Allen Angel's and Garyn Angel's rights in the Garnished Funds by virtue of blanket security agreements and corresponding UCC-1 filings in favor of Mittman, as collateral agent for each of the members of the Collusive Investor Group.

### Overreaching and Fraudulent Conduct by the Collusive Investor Group

29.     The Collusive Investor Group, a majority of which are offshore institutional hedge funds managed by United States based managers, have and continue to engage in a pattern of transferring Debtor's assets to their benefit in a collusive effort to gain financial and operational control of Debtor at the expense and detriment of Debtor's bona fide creditors and shareholders.

30.     The Collusive Investor Group exercised dominion and control over Debtor to such an extent that the Collusive Investor Group is in essence a successor in interest to Debtor.

31.     Mittman has acknowledged that the Collusive Investor Group is the Debtor's successor in interest by way of *Barbara R. Mittman and Grushko & Mittman, P.C.'s Motion for Relief from Judgment as Successor in Interest to VoIP, Inc.'s Assets*, filed by them in the State Court Action, wherein both she and her firm state, "Then on December 13, 2007, the secured interests were subjected to a Lockbox Agreement, whereby all of VoIP's income from Vonage

(and related entities) was to be sent to Grushko & Mittman, P.C., and to be disbursed at the direction of Grushko & Mittman, P.C."

32.     Alternatively, Debtor is the alter ego of the Collusive Investor Group and its members.

33.     The Collusive Investor Group, with the assistance of Mittman, Grushko and G&M, who served as "Escrow Agent" with respect to various transactions consummated between the Debtor and the Collusive Investor Group, controlled Debtor in such a way that the interests of the Collusive Investor Group and its members were as an equity holder and holders, respectively, rather than as the holder or holders of debt, respectively.

34.     The relationship between Debtor and the Collusive Investor Group was designed and implemented as a parasitic relationship to drain the financial life out of the Debtor for the direct personal gain of the Collusive Investor Group, in preference to Debtor's bona fide creditors and shareholders.

35.     The Collusive Investor Group's wrongful conduct, which to date has gone unchecked, include: (i) defrauding bona fide creditors of the Debtor; (ii) defrauding the investing public; and (iii) profiting from such scheme at the expense of bone fide creditors, investors, and shareholders. The Collusive Investor Group was able to engage in these continued illicit activities through the actions of its controlling members and Mittman, as the group's agent, it effectuated a stranglehold on Debtor's finances and operations, engaging in illegitimate financing vehicles, creating accounting falsehoods, disseminating lies and other acts of deception.

36.     Through what were referred to as "original issuance discounts" or "OID's", fraudulent "Section 3(a)(10) Settlements," restatements and reissuances of notes and financing vehicles which have provided little to no investment capital to Debtor, and to the contrary,

resulted in less than reasonably equivalent value being provided to Debtor, plus, the employment of puppet managers and consultants at the direction of the Collusive Investor Group and/or Mittman, and the execution of the *Lockbox Escrow Agreement*, the Collusive Investor Group has caused significant harm to the financial vitality of Debtor.

37. Further evidence of the pervasive control the Collusive Investor Group had over the Debtor's financial affairs is the fact that through a series of loan transactions and settlements and refinancing of prior extensions of credit, the Debtor became indebted to the Collusive Investor Group in a principal amount millions of dollars greater than the principal amount of credit purportedly extended by the Collusive Investor Group to the Debtor.

38. Despite the financial windfalls received by the Collusive Investor Group, Debtor was never permitted to actually satisfy the debts to the Collusive Investor Group. Rather, in addition to additional notes and warrants, free trading stock, and other compensation payments, the "settled" debts were consistently "refinanced" and ***new notes*** were issued in favor of the Collusive Investors, with little or no funds paid to the Debtor in consideration. Additionally, the Collusive Investor Group used financial mechanisms such as OID's and credited the substantial funds realized from the 3(a)(10) settlements to the payment of penalties, due diligence fees associated with the new notes (issued to themselves), and satisfaction of high liquidated damages clauses in their loan documents, all resulting in the ultimate destruction of the financial affairs of Debtor.

39. The control over Debtor was so pervasive that, in fact, the Collusive Investor Group made decisions about which creditors to pay, which lawsuits to defend, and on which lawsuits to default.

40. Notably, the effect of these decisions was to pay the judgments and debts of the related Collusive Investor Group and deny payment to bona fide creditors.

41.     In fact, the terms of the *Lockbox Escrow Agreement* includes terms which appear to direct payment to all judgment creditors however, despite the language of the *Lockbox Escrow Agreement*, the Collusive Investor Group takes the now inconsistent position that this contracted right to collect judgment liens from the escrowed funds pursuant to the *Lockbox Escrow Agreement* inures only to their benefit.

42.     This is highlighted by the fact that despite the specific language in the *Lockbox Escrow Agreement* which requires payment to bona fide judgment creditors, the Collusive Investor Group, through its control of G&M, the Escrow Agent under the *Lockbox Escrow Agreement*, refuses to make such payment and have provides no explanation as to its refusal.

43.     The only payments and disbursements the Collusive Investor Group has approved are those 3(a)(10) settlements provided to either members of the Collusive Investor Group, or Debtor's prior management.

44.     The Collusive Investor Group has exceeded the permissible amount of control that a creditor may exert over its debtor and has done so in order to impermissibly exact the assets from the Debtor to its benefit.

45.     The initial stages of this relationship of control permitted Debtor to continue its operations, albeit to the benefit of the Collusive Investor Group.

46.     However, as Debtor's insolvency and ultimate demise became apparent, the Collusive Investor Group caused Debtor to continue operating in a manner which maximized payment to members of the Collusive Investor Group, while simultaneously causing the amount of Debtor's debt to substantially increase to $23,000,000 and stripping its assets of any value and ultimately destroying its stock price by reducing it from $9.00 to $.009.

47.     Clause 3.1(c) of the *Lockbox Escrow Agreement* provides "upon receipt by the Escrow Agent of a final and non-appealable judgment, order, decree or award of a court of

competent jurisdiction (a "Court Order"), the Escrow Agent shall deliver the Escrowed Payment in accordance with the Court Order."

48.    BFI, after obtaining its judgment against the Debtor and prior to assigning its rights to Noctua, made a written demand on the Debtor to pay the judgment, as provided for by the Lockbox Agreement, as did Garyn Angel, Carrie Angel and Allen Angel with respect to each of the judgments they had against the Debtor.

49.    However, despite the above terms of the *Lockbox Escrow Agreement* quoted above and the demands made by the judgment creditors, no funds have been paid and the Debtor and the Collusive Investor Group, through G&M as Escrow Agent, have expressly stated they will not honor the debt.

50.    Instead, the Debtor and the Collusive Investor Group, through the Escrow Agent, have unilaterally decided to only honor judgments in favor of the members of the Collusive Investor Group and the puppet directors and officers they appointed, and not honor other judgments of bona fide creditors.

51.    The prior refusal of the Debtor, the Collusive Investor Group and Escrow Agent to release funds to satisfy the judgments held by Noctua, Garyn Angel, Carrie Angel, and Allen Angel seemingly stems from reliance on the overreaching language found in Section 3.1(a) of the *Lockbox Escrow Agreement*, which states, in part:

> (i) For ninety (90) days from the date of this Agreement the funds in the Lockbox Account shall be released for the expenses of the Borrower, other than the Lockbox Notes, **solely as directed by the Lenders in their absolute discretion**. (ii) Commencing ninety one (91) days from the date of this Agreement the funds in the Lockbox Account shall be released for any expenses of the Borrower, including repayment of the Lockbox Notes, **solely as directed by the Lenders in their absolute discretion**" (emphasis added).

52.    In addition to the foregoing, and as further support that the Collusive Investor Group was in control of the Debtor, is the fact that the Collusive Investor Group, in conjunction

with Escrow Agent, hand-picked and used Debtor's Chief Executive Officer Anthony Cataldo ("Cataldo") and Chief Technology Officer, Shawn Lewis ("Lewis"), as an instrumentalities for their personal gain.

53.     Cataldo has managed or sat on the board of directors of several other public companies which have been involved in financing arrangements with several of the members of the Collusive Investor Group.

54.     The Collusive Investor Group's selection of Lewis  is additionally notable in light of Lewis' criminal and financial past which appears to have been undisclosed to the investing public in direct violation of Item 401(f) of Regulation S-K of the Securities Exchange Act of 1934.

55.     Given the past relationship between some of the members of the Collusive Investor Group and Cataldo, it now seems painfully clear why Cataldo and Lewis did not stop the Debtor's financial bleeding – the Collusive Investor Group allowed Cataldo and Lewis to each receive compensation in excess of $250,000.00 annually and receive an extreme number of non-dilutable stock options, and by virtue of hundreds of thousands of dollars of reimbursements under the guise of "business expenses."

56.     Robert Staats ("Staats"), the Chief Controller and Chief Accounting Officer of the Debtor pre-petition, provided deposition testimony (the "Staats Depo") in the State Court Action that in 2007, Cataldo expensed "over $300,000 worth of travel expense advances, of which less than half was represented by documented invoices or documented receipts," while Lewis' expense reports indicated that he sought reimbursement for $200,000, of which at least $100,000 was charged to "his American Express account that was also tied to a corporate account, never did receive any expense reports for that."

57.    Cataldo and Lewis charged over $100,000 on a single trip to Las Vegas, under the guise of wooing and essentially bribing Vonage senior executives. However, based upon the few receipts that were presented, it was clear that the $100,000 was spent on excessive amounts of booze, strippers and "chicken ranches," more commonly known as houses of prostitution.

58.    The Collusive Investor Group was also using Cataldo and Lewis as public mouthpieces to continually and fraudulently portray Debtor as a healthy and financially stable corporation, with the goal of ensuring that every last cent could be extracted from Debtor by the Collusive Investor Group prior to its ultimate demise.

59.    Debtor, by and through the control of the Collusive Investor Group, consistently issued positive predictions and press releases, despite knowing that Debtor was dangerously insolvent and despite the fact that there was no supportable basis for such statements.

60.    For example, these positive "predictions," or rather false hopes, can be easily outlined with the April 26, 2007 CEOCast Investors Relations call with Cataldo and Lewis (the "CEO/Investors Call") and continued with various press releases through early 2008, until Debtor abruptly announced it was ceasing all business operations on February 5, 2008.

61.    Such false and misleading information continued to bolster public investor confidence, prop up VOIP's stock price and provide the Collusive Investor Group a false positive market in which to sell their shares of VOIP's, all to the detriment of the public shareholders.

62.    Highlights of the above mentioned inflated press releases include such inflammatory positive headlines as:

a.    **February 2, 2007**- VoIP Announces Assignment of $1.9 Million Secured Note Payable to Group of Investors; New Investors Suspend Company's Requirement to Make Monthly Cash Payments, and Sign Term Sheet to Exchange Note into Convertible Debentures

b. **February 20, 2007**- VoIP Completes $4.7 Million Private Placement; Financing Includes Assignment of $1.9 Million Secured Note and Working Capital

c. **February 26, 2007**- VoIP, Inc. Announces Strong Growth in Minutes Carried and Improved Operating Margins at VOIPeOne Subsidiary

d. **April 25, 2007**- VoIP, Inc. to Provide Update for Investment Community on April 26th; Company to Hold Conference Call at 10:30 A.M. Eastern Time

e. **April 30, 2007**- VoIP Inc. Announces 2007 Financial Outlook; Revenue Expected to Exceed $30 Million

f. **May 21, 2007**- VoIP Improves Balance Sheet Through Reduction of $11.5 Million in Liabilities

g. **August 27, 2007**- VoIP, Inc. Issues Letter to Shareholders; Company Expects To Generate Positive Operating Cash Flow During 2007 Fourth Quarter

h. **September 06, 2007**- VoIP, Inc.'s August Revenue from Continuing Caerus Business Exceeds $1 Million; Operating Results Continue to Improve

i. **September 12, 2007**- VoIP Doubles Size of National Network Infrastructure to Accommodate Additional Customers and Growing Traffic

j. **October 18, 2007**- VoIP Announces Continued Largest Increases in Network Traffic Since its Inception Company Also Generates Improved Operating Margins

k. **December 27, 2007**- VoIP, Inc. Enters Into $2.5 Million Private Placement

l. **January 23, 2008**- VoIP, Inc. Announces Proprietary Patented ``Click-to-Call''

m. **February 5, 2008**- VoIP, Inc. Launches "RazrClick," the Patented Pay-Per-Click

63.    These press releases included many on the subject of the Collusive Investor Group's financings. Such press releases would disclose the total amount of financings in each deal, but would fail to specifically disclose the actual funds received by Debtor in each financing, thus further misleading the investing public with each such release.

64.    For example, on December 27, 2008, Debtor released a press release regarding the "Lockbox Investment" disclosing that the financing "resulted in net proceeds to the Company of $2,497,044."

13

65.     However, once the Collusive Investor Group was repaid portions of the previous notes and related "penalties" owed to some of its members, such financing only resulted in a net payment of $529.094 to the Debtor, a mere 20% of the publicly disclosed amount.

66.     Finally, as mentioned above, on February 5, 2008, Debtor shook the investing public through its announcement via a Form 8-K filed with the SEC that it had decided to suspend all of its telecommunications network operations that compromised all of its revenue generating operations.

67.     Interestingly, and as seen above, Debtor, **_on the same day_**, released a false positive press release, without a related Form 8-K, on the launch of its "RazrClick" technology, with no mention of its intention to cease all other business operations.

68.     Even more disturbing than the press releases is the CEO Cast Investors Relations call, throughout which, Debtor's CEO, Cataldo and its Chief Technology Officer, Lewis, made numerous positive, albeit unfound, statements regarding the company's operational and financial outlook, including the following:

> a.  We have attracted blue-chip customers, stabilized our operations, received new capital and had continued our operating results, to increase our operating results, every month. Many of you, I'm sure have seen recent announcements about relationships we have entered into with blue-chip companies in the Internet and telecom sector. There are many other companies that we have added and we'll continue to add and/or on the verge of reaching deals shortly;

> b.  I would also like to share with you what this means for you as an investor. For fiscal year 2007, we expect to generate revenue in excess of $30 million; gross profit in excess of $10 million… We are even more excited about our prospects in 2008." (emphasis added);

> c.  This company is a really good business that is growing rapidly, that is going to throw off significant income in the future; and

> d.  We've turned this thing around, we are not going out of business, we have signed significant customers into our network, we are continuing to do that and are on the verge of signing more deals as we move forward. <u>This is the best situation this company has ever been in and ultimately, we will win by</u>

<u>running a fundamentally sound company that is an earnings-generated business.</u>" (emphasis added).

69.     Many of the press releases, and most importantly the CEO Cast Investors Relations Call, were blatant misrepresentations with no factual basis and were objected to by Debtor's internal management.

70.     Staats, during the course of his deposition in the State Court Action, testified that no projections were made that led to the $30 million in annual revenue noted during the CEO Cast Investors Relations Call, and that there was no sound basis for making such a projection and that he repeatedly voiced his opinion, as Chief Controller and Chief Accounting Officer, against making such statements to the investing public fell.

71.     Despite this fact, Debtor, and more specifically Cataldo and Lewis, chose to bypass and ignore Staats detailed knowledge of VOIP's financial standing and disclose materially false and misleading information regarding such financial status to the general investing public.

72.     One of the primary purposes of the above described false and misleading press releases was to keep the stock price up so that the Debtor and the Collusive Investor Group could extricate maximum value from the sale of Debtor's stock, including those shares released under settlements pursuant to §3(a)(10) of the 1933 Securities Act (15 U.S.C. § 77c).

73.     Section 3(a)(10) is an exemption to the registration requirement under the 1933 Securities Act which is utilized by public companies to issue unrestricted, unlegended, free trading shares of that company's common stock to be sold to the general investing public to satisfy valid company debts.

74.     The Section 3(a)(10) settlements did not occur in a vacuum and the value of these settlements was coupled with and directly affected by the aforementioned press releases and public misrepresentations. The Section 3(a)(10) Settlements, along with the false press releases,

constituted a classic "pump and dump" scheme designed to create substantial profits for the Collusive Investor Group while maintaining the Collusive Investor Group's large debt position and operational control, all to the detriment of bona fide public investors. Accordingly, the issuances and prepackaged court approved settlements were for the benefit of existing and former directors and officers and their accomplices, the Collusive Investor Group.

75.    In fact, Debtor utilized Section 3(a)(10) settlement procedures "several times" to issue a total of over 25,000,000 shares of its free trading stock to several persons and entities of the Collusive Investor Group, including Debtor's management.

76.    The free trading shares referenced in the preceding paragraph, based on the then current market price, carried an approximate market value of over $25,000,000.

77.    In fact, and not coincidentally, the 3(a)(10) mechanisms for obtaining free trading shares of Debtor's stock were first introduced to Debtor immediately following the appointment of Cataldo as CEO of the Debtor by the Collusive Investor Group on September 14, 2006 and the first 3(a)(10) settlement occurred the following day on September 15. 2006.

78.    The timing in which many of these "settlements" were reached is yet another indicator of the fraudulent and collusive nature of the transactions.    Notably, in one Section 3(a)(10) Settlement with almost *all* of the members of the Collusive Investor Group, a 71 page complaint was filed on September 14, 2006 and a settlement agreement was filed and reached within six days of the filing.

79.    These multiple issuances of free trading shares flooded the market with an excess and enormous supply of Debtor's shares forcing the overall market value and stock price down from $9.00 to $.0009 to the detriment of Debtor's general shareholder and creditor population, and resulted in its ultimate demise.

80.     The Section 3(a)(10) Settlements occurred to the detriment of Debtor's bona fide creditors and shareholders, while simultaneously assuring the Collusive Investor Group's receipt of substantial funds, in excess of any legitimate claims held by said Collusive Investor Group, and at the exclusion of all others.

81.     Despite the large amounts of stock realized from the above described settlements, purportedly to satisfy or partially satisfy debt obligations, the Collusive Investor Group nonetheless continues to claim to be owed substantial funds and claims to be secured on such debt.

82.     In other words, Debtor never actually satisfied the debts to the Collusive Investors Group. Rather, in addition to the payment of free trading stock, the "settled" debts were refinanced and new notes were issued in favor of the members of the Collusive Investor Group, with little or no funds paid to Debtor in consideration.

83.     Additionally, the Collusive Investor Group used additional underhanded financial mechanisms such as (i) OID's; (ii) crediting the substantial funds realized from the 3(a)(10) settlements to the payment of penalties; (iii) due diligence fees associated with the new notes (issued to themselves); and (iv) satisfaction of high liquidated damages clauses in their loan documents, rather then the payment of the principal amounts.

84.     Through these mechanisms they could keep the outstanding loans current on their books while at the same time profiting from sales in the market of Debtor's securities to the retail investing public.  The net result is that the Collusive Investor Group received in excess of $22 million, approximately $5 million more than their original claimed investments and still assert a $23 million dollar receivable from VOIP.

85.     In addition to the §3(a)(10) "loophole" that the Debtor and the Collusive Investor Group exploited above, the Debtor and the Collusive Investor Group utilized a short form registration statement known as an "S-8 Registration."

86.     The Collusive Investor Group, through Debtor's management, used this exception to SEC registration requirements to provide themselves again, with freely tradeable stock which was immediately flooded into the public retail investing market.

87.     An S-8 Registration statement is effective immediately without SEC review, and allows a public company to issue free trading shares of its common stock to employees and consultants provided such issues are (i) natural persons, (ii) provide bona-fide services to the public company, and (iii) such services are not related to any capital raising transaction or promotion of a public market for the company.

88.     The SEC has cracked down on the issuance of S-8 shares in the last few years due to the rampant misuse of this short form registration to insiders and entities/persons involved in capital raising activities.

89.     After detailed research into Debtor's S-8 Registration Statements and subsequent issuances of over 12,700,000 free trading shares of common stock, many of the issuances are to off-shore entities for questionable, if not non-existing, services.

90.     Although some of these S-8 issuances seem to be for valid purposes, many of the underlying service contracts do not describe the services to be provided to the Debtor, instead, they simply state the compensation to be paid.

91.     For example, of questionable nature is the March 28, 2007 "consulting agreement" with David Mun-Gavin (the "Mun-Gavin Agreement") wherein Mr. Mun-Gavin, a resident of the Netherlands, was provided an option to purchase 3,000,000 shares of Debtor's common stock at a purchase price of $0.20 per share. Further research into Mr. Mun-Gavin's

financing history reveals that Mr. Mun-Gavin has multiple historical involvements with Bristol (one of the Collusive Investors), and its funding to the Debtor.

92.     The issuance of shares pursuant to an "S-8 Registration" to entities and individuals related to the Collusive Investor Group was nothing more than a short selling scheme and not payment for any type of legitimate services or value provided to the Debtor.

93.     The final "investment" made by the Collusive Investor Group was the "Lock Box Investment" initially made on December 18, 2007.

94.     The overall financing called for $2,871,601 in convertible notes, but only a net purchase price of $2,497,044 to close in three closings.

95.     The first closing occurred on December 18, 2008 for $1,550,800; $115,427 went to the Escrow Agent's closing costs, $906,279 to pay down existing Collusive Investor Group notes, thus leaving only $529,094 to Debtor. Thus, out of $1,550,800 in notes issued in this financing, a meager third was actually received by Debtor to utilize for business operations, while the lion's share was disbursed to the Collusive Investor Group.

96.     The second closing occurred on January 18, 2008 for $574,261; $53,680 went to closing costs, $152,016 to pay down existing Collusive Investor Group notes and only $368,656 went to Debtor directly. Thus, out of $574,261 in notes issued in this financing, a meager $368,656 was actually received by Debtor to utilize for business operations.

97.     The third closing for the balance of $574,261 was scheduled to close on February 18, 2008, but never closed due to Debtor's ceasing operations on February 5, 2008. Accordingly, Debtor received nothing from that closing.

98.     In connection with the Lock Box Investments notes, the parties entered into that certain *Lockbox Escrow Agreement*, which required all of the cash proceeds from this financing, as well as all cash receipts from operations and proceeds from future financings, to be deposited

into a lockbox account controlled by the Collusive Investor Group and notably by Mittman as escrow agent.

99.    In other words, the Collusive Investor Group had complete control over if and when Debtor could use the money purportedly loaned to it and had complete discretion to pay themselves with such funds.

100.    Cash disbursements made from the lockbox account on Debtor's behalf were required to be directed by the investors at their sole discretion.

101.    Accordingly, upon execution of the *Lockbox Escrow Agreement*, the Collusive Investor Group no longer had *de facto* control of Debtor and its assets, but complete and autonomous control over Debtor's funds, highlighted by §3.1(a) of the Lockbox Escrow Agreement, which states:

(a)  Upon receipt of the Receivable they shall be released:

(i) For ninety (90) days from the date of this Agreement the funds in the Lockbox Account shall be released for the expenses of the Borrower, other than the Lockbox Notes, **solely as directed by the Lenders** in their absolute discretion.

(ii) Commencing ninety one (91) days from the date of this Agreement the funds in the Lockbox Account shall be released for any expenses of the Borrower, **including repayment of the Lockbox Notes**, **solely as directed by the Lenders** in their absolute discretion.

*Lockbox Escrow Agreement*, §3.1(a)(emphasis added).

102.    The reason for the new "lockbox structure" rather than the issuance of new notes or shares of Debtor's stock, as previously done, was the fact the Debtor no longer had the ability to fund "settlements" with stock because of its devaluation resulting from the sales of large blocks of stock by members of the Collusive Investor Group and Debtor's management.

103.    The *Lockbox Escrow Agreement* was the proverbial "bullet" that caused the Debtor to close its doors and cease operations, and was the Collusive Investor Group's final attack upon Debtor's revenue stream, which was the one remaining source of funds.

20

104.    The timing of the creation and implementation of *Lockbox Escrow Agreement* is no coincidence, because such came about at the same time the Debtor was required to seek financing from investors not affiliated with the Collusive Investor Group because additional funding from the Collusive Investor Group was not forthcoming inasmuch as prior funding schemes by the Collusive Investor Group made additional financing opportunities risky at this juncture.

105.    Thus, in order to protect their prior, overstated claims from dilution and competition for payment by the outside investors, the Collusive Investor Group entered into the "Lockbox" arrangement in order to block any opportunity by such outside investors to recuperate any of their investment because the operation of the lockbox prevented funds from coming under the control of the Debtor, and thus, subject to disbursement to the "outside investors."

106.    The creation of the "Lockbox" arrangement just after BFI filed its suit against the Debtor on November 28, 2007 is further evidence that the timing of such was all part of a scheme in which the Collusive Investor Group sought to prevent Debtor's other legitimate creditors from being repaid.

107.    Moreover, the extent of the control exerted by the Collusive Investor Group under the *Lockbox Escrow Agreement* was so great that the Collusive Investor Group actually dictated whether and to what extent Debtor was able to defend itself in connection with pending legal actions – including the litigation by BFI, Stuart Kosh, Carrie Angel, and Allen Angel.

108.    In fact, Debtor's defaults in connection with the underlying judgments in favor of the forenamed judgment creditors are direct and purposeful events dictated by the Collusive Investor Group.

109.     The decision to forgo the retention of counsel and defense of the state court matters was an intentional decision and one which was at the direction of the Collusive Investor Group.

110.     This plan to avoid paying any bona fide creditors is also highlighted by the fact Debtor expressly diverted funds away from its Wachovia account due to the Wachovia garnishment action filed by BFI.

111.     The results of the perverse control of Debtor by the Collusive Investor Group and Escrow Agent include: (i) exorbitant payments to Debtor's officers; (ii) illegitimate settlements pursuant to §3(a)(10) of the Securities Act of 1933 settlements (the "33 Act")("Section 3(a)(10) Settlements"); (iii) the *Lockbox Escrow Agreement* executed by the Debtor in favor of the Collusive Investor Group and Escrow Agent and the proceeds therefrom; and (iv) issuance of S-8 stock to directors, officers and puppet entities.

### Allen Angel's Notes, Judgment and Writ of Garnishment

112.     As noted above, Allen Angel holds a judgment against the Debtor in the principal amount of $89,109.25, entered on January 29, 2008 by the Honorable Thomas M. Lynch, IV, Judge of the Circuit Court of the Seventeenth Judicial Circuit, Broward County, Florida in the action styled  *Angel v. VoIP, Inc.*, Case No. 07-35933 (04).

113.     The judgment was for damages stemming from the breach of two promissory notes given by the Debtor to Allen Angel, both dated September 26, 2007.

114.     The first note was in the principal amount of $200,000.00 and called for payment by the Debtor of $250,000.00 on or before October 4, 2007.

115.     The second note was in the principal amount of $36,250.00 and called for payment by the Debtor of the same amount on or before October 4, 2007.

116.    Following entry of the judgment in his favor, Allen Angel served Vonage with a writ of garnishment on February 28, 2008.

<u>**COUNT I – 11 U.S.C. §547(b)(4)(A)**</u>
**(Mittman, the Collusive Investor Group, Grushko, Mun-Gavin, Cataldo and Lewis)**

117.    The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

118.    The transfers of the property and interests to the defendants named herein were transfers of an interest in property of the Debtor.

119.    The transfers were on account of antecedent debts owed by the Debtor to the defendants named herein.

120.    The transfers were made while the Debtor was insolvent.

121.    The transfers were made on or within 90 days before the date of the filing of the bankruptcy petition.

122.    The transfers enabled the defendants named herein to receive more than these defendants would receive in this chapter 7 case, the transfers had not been made, and these defendants received payment of such debt to the extent provided by the provisions of the United States Bankruptcy Code (Title 11, U.S. Code).

WHEREFORE, the Plaintiffs, by and through their respective undersigned counsel, pursuant to 11 U.S.C. § 547(a), respectfully request the entry of a judgment against the defendants named herein, avoiding the transfers to each of them, and the Plaintiffs respectfully request any further relief this Honorable Court deems just and proper, including awarding damages equal to the value of the transfers as provided for by 11 U.S.C. § 550(a).

<u>**COUNT II – 11 U.S.C. §547(b)(4)(B)**</u>
**(Mittman, the Collusive Investor Group, Grushko, Mun-Gavin, Cataldo and Lewis)**

23

123.    The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

124.    The transfers of the property and interests to the defendants named herein were transfers of an interest in property of the Debtor.

125.    The transfers were on account of antecedent debts owed by the Debtor to the defendants named herein.

126.    The transfers were made while the Debtor was insolvent.

127.    The transfers were made between 90 days and one year before the date of the filing of the bankruptcy petition.

128.    The transfers enabled the defendants named herein to receive more than these defendants would receive in this chapter 7 case, the transfers had not been made, and these defendants received payment of such debt to the extent provided by the provisions of the United States Bankruptcy Code (Title 11, U.S. Code).

WHEREFORE, the Plaintiffs, by and through their respective undersigned counsel, pursuant to 11 U.S.C. § 547(a), respectfully request the entry of a judgment against the defendants named herein, avoiding the transfers to each of them, and the Plaintiffs respectfully request any further relief this Honorable Court deems just and proper, including awarding damages equal to the value of the transfers as provided for by 11 U.S.C. § 550(a).

### Count III – 11 U.S.C. § 544 and Fla. Stat. § 726.106(2)
**(Mittman, the Collusive Investor Group, Grushko, Mun-Gavin, Cataldo and Lewis)**

129.    The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

130.    The transfers to each of the defendants named herein were transfers of an interest in property of the Debtor.

131.    The defendants named herein are insiders of the Debtor as that term is defined by

Florida Statutes, § 726.102.

132.    The transfers were on account of an antecedent debt.

133.    The Debtor was insolvent at that time of the transfer.

134.    The defendants named herein had reasonable cause to believe that the Debtor was insolvent at such time of each transfer.

135.    The Plaintiffs are, thus, entitled to avoidance of the transfers for the benefit of the bankruptcy estate.

WHEREFORE, Plaintiffs, by and through their respective undersigned counsel, pursuant to Fla. Stat. § 726.106(2), as made applicable to this proceeding pursuant to 11 U.S.C. § 544, respectfully requests the entry of a judgment against the defendants named herein, avoiding the transfers to each of them, and Plaintiffs respectfully request any further relief this Honorable Court deems just and proper, including awarding damages equal to the value of the transfers as provided for by 11 U.S.C. § 550(a) and Fla. Stat. § 726.108(c)(3).

### Count IV - 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(a)
**(Mittman, the Collusive Investor Group, Grushko, Mun-Gavin, Cataldo and Lewis)**

136.    The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

137.    The Debtor transferred its interest in property to each of the defendants named herein with the actual intent to hinder, delay, or defraud its creditors.

138.    The transfers were to insiders.

139.    The Debtor retained possession or control of the transfers after the transfers were made.

140.    The transfers were, at times, concealed.

141.    Before the transfers were made, the Debtor had been sued or was threatened with being sued, and in some cases, the transfers were made after judgments were entered against the

Debtor.

142.    The transfers were of substantially all the Debtor's assets.

143.    The Plaintiffs are, thus, entitled to an avoidance of the transfers for the benefit of the bankruptcy estate.

WHEREFORE, Plaintiffs, by and through their respective undersigned counsel, pursuant to Fla. Stat. § 726.105(1)(a), as made applicable to this proceeding pursuant to 11 U.S.C. § 544, respectfully request the entry of a judgment against the defendants named herein, avoiding the transfers of the Debtor's interest in property to each of these defendants, and Plaintiffs respectfully request any further relief this Honorable Court deems just and proper, including awarding damages equal to the value of the transfer as provided for by 11 U.S.C. § 550(a) and Fla. Stat. § 726.108(c)(3).

### Count V - 11 U.S.C. § 544 and Fla. Stat. § 726.105(1)(b)
### (Mittman, the Collusive Investor Group, Grushko, Allen Angel, Mun-Gavin, Cataldo and Lewis)

144.    The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

145.    The transfers to each of the defendants named here were transfers of property of the Debtor.

146.    The Debtor transferred its interest in the property without receiving reasonably equivalent value in exchange for each of the transfers, and the Debtor:

        a.   was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or

        b.   intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

147.    Plaintiffs are, thus, entitled to an avoidance of the transfers for the benefit of the bankruptcy estate.

WHEREFORE, Plaintiffs, by and through their respective undersigned counsel, pursuant to Fla. Stat. § 726.105(1)(b), as made applicable to this proceeding pursuant to 11 U.S.C. § 544, respectfully request the entry of a judgment against the defendants named herein, avoiding the transfers of the Debtor's interests in the property transferred to each of these defendants, and Plaintiffs respectfully requests any further relief this Honorable Court deems just and proper, including awarding damages equal to the value of each of the transfers, as provided for by 11 U.S.C. § 550(a) and Fla. Stat. § 726.108(c)(3).

### Count VI - 11 U.S.C. § 544 and Fla. Stat. § 726.106(1)
**(Mittman, the Collusive Investor Group, Grushko, Allen Angel, Mun-Gavin, Cataldo and Lewis)**

148.    The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

149.    The transfers to each of the defendants named herein were transfers of property of the Debtor.

150.    The Debtor transferred its interest in the property transferred to each of the defendants named herein without receiving reasonably equivalent value in exchange for each of the transfers.

151.    The Debtor was insolvent at the time of each of the transfers or the Debtor became insolvent as a result of the transfers.

152.    Plaintiffs are, thus, entitled to an avoidance of the transfers for the benefit of the bankruptcy estate.

WHEREFORE, Plaintiffs, by and through their respective undersigned counsel, pursuant to Fla. Stat. § 726.106(1), as made applicable to this proceeding pursuant to 11 U.S.C. § 544,

respectfully request the entry of a judgment against the defendants named herein, avoiding each of the transfers of the Debtor's interest in the property transferred to each of these defendants, and the Plaintiffs respectfully request any further relief this Honorable Court deems just and proper, including awarding damages equal to the value of each of the transfers, as provided for by 11 U.S.C. § 550(a) and Fla. Stat. § 726.108(c)(3).

**Count VII - 11 U.S.C. § 548(a)(1)(A)**
**(Mittman, the Collusive Investor Group, Grushko, Mun-Gavin, Cataldo and Lewis)**

153.     The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

154.     The transfers to each of the defendants named herein were transfers of property of the Debtor.

155.     The Debtor made each of the transfers with the actual intent to hinder, delay, or defraud its creditors.

156.     Plaintiff is, thus, entitled to an avoidance of the transfers for the benefit of the bankruptcy estate.

WHEREFORE, Plaintiffs, by and through undersigned counsel, pursuant to 11 U.S.C. § 548(a)(1)(A), respectfully request the entry of a judgment against the defendants named herein, avoiding the transfers of the Debtor's interest in the property to each of these defendants, and Plaintiffs respectfully request any further relief this Honorable Court deems just and proper, including awarding damages equal to the value of each of the transfers, as provided for by 11 U.S.C. § 550(a) and Fla. Stat. § 726.108(c)(3).

**Count VIII – 11 U.S.C. § 548(a)(1)(B)**
**(Mittman, the Collusive Investor Group, Grushko, Allen Angel, Mun-Gavin, Cataldo and Lewis)**

157.     The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

28

158.    The transfers to each of the defendants named herein were transfers of property of the Debtor.

159.    The Debtor received less than a reasonably equivalent value in exchange for each of the transfers and

c.    was insolvent on the date that each transfer was made, or became insolvent as a result of such transfer;

d.    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital;

e.    intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured; or

f.    made such transfer to or for the benefit of an insider.

160.    Plaintiffs are, thus, entitled to an avoidance of each of the transfers.

WHEREFORE, Plaintiffs, by and through their respective undersigned counsel, pursuant to 11 U.S.C. § 548(a)(1)(B), respectfully request the entry of a judgment against the defendants named herein, avoiding the transfers of the Debtor's interest in the property to each of these defendants, and Plaintiffs respectfully requests any further relief this Honorable Court deems just and proper, including awarding damages equal to the value of each of the transfers, as provided for by 11 U.S.C. § 550(a) and Fla. Stat. § 726.108(c)(3).

## COUNT IX – RECHARACTERIZATION OF DEBT TO EQUITY
### (Mittman and the Collusive Investor Group)

161.    The allegations of paragraphs 1 through 1166 are incorporated by reference as if set forth fully herein.

162.    The loans at issue in this matter were only nominally "loans" from the outset.

163.    The true purpose of the transactions was to create an equity investment in and to receive an equity position in the Debtor.

164.    The "debts" claimed by the members of the Collusive Investor Group are in fact equity investments in the Debtor and should be treated as such.

WHEREFORE, Plaintiffs request that the Court enter judgment characterizing and prioritizing the claims of the members of the Collusive Investor Group as equity in the Debtor.

## COUNT X – BREACH OF CONTRACT
### (The Collusive Investor Group)

165.    The allegations of paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

166.    The Collusive Investor Group has breached the *Lockbox Escrow Agreement*, which requires payment to bona fide judgment creditors, by refusing to make such payments upon satisfaction of the conditions precedent stated there in.

167.    VOIP, and now the estate, have been damaged by virtue of such breach.

WHEREFORE, Plaintiffs request that the Court enter judgment for damages, for specific performance, or alternatively subordinating and offsetting the interests and claims of the Collusive Investor Group any claimed lien in the Garnished Funds or other property of the estate, to the holders of valid final judgments against the Debtor, for costs, fees, and for such other relief as is proper under the circumstances.

## COUNT XI – SUBORDINATION AGREEMENT – 11 U.S.C. §510(a)
### (The Collusive Investor Group)

168.    The allegations of paragraphs 1 through 116116 are incorporated by reference as if set forth fully herein.

169.    Section 510(a) of the Bankruptcy Code (Title 11, U.S. Code) provides that "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."

170.    The Collusive Investor Group has, pursuant to nonbankruptcy law, agreed to subordinate their interests to those of the holder of a valid final judgment against the Debtor.

WHEREFORE, Plaintiffs request that the Court enter judgment subordinating the interests and claims of the Collusive Lender Group, pursuant to 11 U.S.C. §510(a), including any claimed lien in the Garnished Funds or other property of the estate, to the holders of valid final judgments against the Debtor, for costs, fees, and for such other relief as is proper under the circumstances.

## COUNT XII – SUBORDINATION– 11 U.S.C. §510(b)
### (The Collusive Investor Group)

171.    The allegations of paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

172.    Section 510(b) of the Bankruptcy Code provides that "[F]or the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."

173.    The claims of the Collusive Investor Group arise from transactions which are for the purchase and sale of securities of the Debtor, and damages arising from the purchase or sale of securities.

174.    Such transactions include, but are not limited to, convertible notes, warrants, settlements pursuant to §3(a)(10) of the 1933 Securities Act, and the other means by which the Collusive Investor Group effectuated the "PIPE" transactions.

WHEREFORE, Plaintiffs request, pursuant to 11 U.S.C. §510(b), that the Court enter judgment subordinating the interests and claims of the Collusive Investor Group, including any claimed lien in the Garnished Funds or other property of the estate, to the same priority of the securities which were consideration for the various transactions, including common stock, for costs, and for such other relief as is proper under the circumstances.

### COUNT XIII – EQUITABLE SUBORDINATION – 11 U.S.C. §510(c)
### (The Collusive Investor Group)

175.    The allegations of paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

176.    The equities in this case dictate that any and all of each of the Collusive Investor Group's claims, if any, whether filed or to be filed or amended, liquidated or contingent, disputed or undisputed, scheduled or unscheduled, asserted against the Debtor's bankruptcy estate, be subordinated to all other claims except those of equity security holders pursuant to Section 510(c) of the Bankruptcy Code.

177.    Such equitable subordination is supported by the Collusive Investor Group's inequitable conduct, alleged herein, and which provided each and every Collusive Investor with benefits and unfair advantages at the expense of VOIP's creditors and shareholders.

178.    Given the conduct of the Collusive Investor Group, subordinating the amounts which may be owed to the Collusive Investor Group under §510(c) is not inconsistent with the provisions of the Bankruptcy Code.

WHEREFORE, Plaintiffs request, pursuant to 11 U.S.C. §510(c), that the Court enter judgment subordinating the interests and claims of the Collusive Lender Group, including any

claimed lien in the Garnished Funds or other property of the estate, to the same priority of equity security holders, for costs, and for such other relief as is proper under the circumstances.

### COUNT XIV – VALIDITY, EXTENT AND PRIORITY OF LIENS
**(Mittman, the Collusive Investor Group, Garyn Angel, and Allen Angel)**

179.    The allegations of paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

180.    The defendants named herein assert competing interests in the assets of the Debtor, including the Garnished Funds.

181.    The defendants named herein assert conflicting claims and theories under both state law and the Bankruptcy Code.

182.    There is a real and immediate controversy as to the claimed liens in property of the estate, including the Garnished Funds.

183.    Plaintiffs request a judicial determination of the extent, validity and priority of such liens.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against the defendants named herein, determining the validity, priority, and extent of liens claimed by the defendants named herein, including any liens in the Garnished Funds, and for any further relief that the Court deems just and proper.

### COUNT XV – INSTRUMENTALITY AND SUCCESSOR LIABILITY
**(Mittman and the Collusive Investor Group)**

184.    The allegations of paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

185.    The conduct of the Collusive Investor Group and Mittman are such that the Debtor was under the complete control and was an instrumentality of Mittman and the Collusive Investor Group.

186.    The Collusive Investor Group and Mittman exercised sufficient control over the operations, management, and assets of the Debtor that they controlled all key business and financial decisions of the Debtor.

187.    The Collusive Investor Group and Mittman's control over the Debtor was used to achieve inequitable and unjust benefits for themselves and to hinder, delay and defraud the creditors and shareholders of VOIP as well as to skirt the requirements and regulations related to the purchase, sale, and registration of the Debtor's securities.

WHEREFORE, Plaintiffs request that the Court enter judgment against the Collusive Investor Group and Mittman, determining that VOIP was their instrumentality, that they are the successors to VOIP and that they are liable for the debts of VOIP, for damages, costs, and such other relief as the Court deems just and proper.

## COUNT XVI - BREACH OF FIDUCIARY DUTY
### (Mittman and the Collusive Investor Group)

188.    The allegations of paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

189.    The conduct of the Collusive Investor Group and Mittman are such that they owed a fiduciary duty to the Debtor and its shareholders.

190.    The Collusive Investor Group and Mittman exercised sufficient control over the operations, management, and assets of the Debtor that they exceeded the role of lenders and are insiders of the Debtor.

191.    The Collusive Investor Group and Mittman controlled all key business and financial decisions of the Debtor.

192.    Moreover, Mittman owes an express fiduciary duty by virtue of her role as collateral agent and escrow agent.

193.    The Collusive Investor Group and Mittman have breached their fiduciary duties.

194.    The Debtor and its creditors were damaged as a result of such breach.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Mittman and the Collusive Investor Group for damages, costs, and for any further relief that the Court deems just and proper.

## COUNT XVII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Mittman, Grushko and the Collusive Investor Group)

195.    The allegations of paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

196.    If and to the extent that any of the Collusive Investor Group or Mittman are found not to have had a fiduciary duty to the Debtor at the relevant times complained herein, or to have a limited duty that does not extend to any particular conduct, each member of the Collusive Investor Group, Mittman, and Grushko is nevertheless liable for having aiding and abetted the breach of fiduciary duty by Mittman and/or one or more of the other members of the Collusive Investor Group possessing such duties at the same relevant times.

197.    Each member of the Collusive Investor Group, Mittman, and Grushko had knowledge of the breaches of fiduciary duty asserted herein and rendered substantial assistance and/or encouragement in regard to and benefited from such acts and omissions of one another and any of the remaining members of the Collusive Investor Group.

198.    Based upon the foregoing, the members of the Collusive Investor Group, Mittman, and Grushko are liable for all damages proximately caused by the acts and omissions of one another and of the remaining members of the Collusive Investor Group and Mittman.

199.    The foregoing breaches, as aided and abetted by each member of the Collusive Investor Group, Mittman, and Grushko proximately caused damages to the Debtor, its shareholders and creditors.

WHEREFORE, the Plaintiffs respectfully request entry of a judgment against the members of the Collusive Investor Group, Mittman and Grushko, jointly and severally for damages suffered by the Debtor including all attributable and allowable attorneys' fees, costs, prejudgment interest and for such other relief as this Court deems appropriate.

### Count XVIII – TURNOVER
**(Vonage)**

200.    The allegations of paragraphs 1 through 116 are incorporated by reference as if set forth fully herein.

201.    The Garnished Funds are property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a).

202.    Accordingly, the bankruptcy estate is entitled to turnover of the Garnished Funds from Vonage for administration by the chapter 7 trustee.

WHEREFORE, Plaintiffs, by and through their respective undersigned counsel, respectfully request the entry of a judgment directing Vonage to turnover the Garnished Funds to the chapter 7 trustee and grant Plaintiffs any further relief this Honorable Court deems just and proper.

We hereby certify that we are admitted to the Bar of the United States District Court, and that we are in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

Respectfully submitted

Dated this 30th day of November 2009.

**SLATKIN & REYNOLDS, P.A.**
Attorneys for Trustee
One East Broward Boulevard, Suite 609
Fort Lauderdale, Florida 33301
Telephone 954.745.5880
Facsimile 954.745.5890
jslatkin@slatkinreynolds.com

By: /s/ Jason E. Slatkin
    Jason E. Slatkin
    Fla. Bar No. 040370

**RICE, PUGATCH ROBINSON & SCHILLER, P.A.**
Counsel for Plaintiff, Noctua Fund, LP
101 N.E. 3rd Ave, Suite 1800
Ft. Lauderdale, FL  33301
Phone: (954) 462-8000
Fax:    (954) 462-4300

By:  /s/ Craig A. Pugatch
         Craig A. Pugatch, Esq.
         Florida Bar No.: 653381